Argued March 19, modified April 13, 1915.

## HIGHLAND *v.* TOLLISEN.

(147 Pac. 558.)

**Executors and Administrators—Accounting—Suit to Vacate Order—Sufficiency of Evidence.**

1. In a suit to vacate an order of the County Court approving defendant's final account as administrator, evidence *held* to show that each of the decedent's heirs had signed a writing waiving and conveying to defendant all their right, title, and interest in a certain lot which had stood in decedent's name.

**Executors and Administrators—Accounting—Waiver by Heirs—Effect.**

2. Such writing whereby the defendant secured a title to the land in consideration of $500, which was then its reasonable and full value, constituted a settlement and distribution by those heirs who at the time of its execution were of legal age.

**Limitations of Actions—Contracts—Avoidance by Infants.**

3. A son of decedent who was a minor when he signed an agreement waiving his interest in a lot owned by decedent, and who did not assert any right to the land within ten years after he became of age, had no right, title, or interest therein, but a daughter whose suit to establish her right therein was begun within ten years after reaching majority was entitled to an interest therein.

   [As to avoidance of contract by infant, see note in 13 Am. Dec. 131. As to reasonable time after majority to disaffirm contracts of infant, see note in 18 Am. St. Rep. 680.]

**Infants—Consideration—Disclaimer.**

4. A minor daughter, who received no consideration for her relinquishment of her interest in her father's estate, was not required, on avoidance after majority, to repay any sum as a consideration precedent to asserting her rights therein, as against the defendant, nor to disclaim her execution of the writing so as not to be bound thereby.

   [As to disaffirmance of contract by infant, when must be accompanied by restoration of consideration, see notes in 62 Am. Dec. 734; 46 Am. Rep. 317.]

Executors and Administrators—Settlement of Estate—Accounting to Heirs.

5. In such case, where defendant had fully paid the sums stated to be paid the heirs, and had made improvements on land, paid the taxes and assessments thereon, he was not accountable to the decedent's heir as cotenant for any sums collected or charged on account of rent or prior payment made by him.

From Multnomah: JOHN S. COKE, Judge.

This is a suit by Anders Highland and others against Ole Tollisen to set aside an order of the County Court made in settling the final account of Ole Tollisen, as administrator of the estate of L. Highland, deceased. The facts are set forth in the opinion of the court.

MODIFIED.

For appellant there was a brief over the name of *Messrs. Flegel, Reynolds & Flegel,* with an oral argument by *Mr. John W. Reynolds.*

For respondents there was a brief over the names of *Messrs. Conley & De Neffe* and *Mr. John R. Downes,* with an oral argument by *Mr. J. L. Conley.*

Opinion by MR. CHIEF JUSTICE MOORE.

This is an appeal by the defendant, Ole Tollisen, from a decree of the Circuit Court of the State of Oregon for Multnomah County vacating an order of the County Court thereof made in approving an administrator's final account. It appears from the evidence that L. Highland died intestate in that county June 8, 1897, and four days thereafter his daughter, Annie Tollisen, the defendant's wife, petitioned the County Court to appoint her husband as administrator of the decedent's estate. The petition stated that the deceased left lot 4 in block 5 in Highland, in that county, which real property was valued at about $250.

A paragraph of the petition gives the names and the then ages and residences of the heirs of the deceased as follows: Hanne Highland, his widow, aged about 46 years, Falsund, Norway; Fred T. Highland, son, Minneapolis, Minnesota, aged 30 years; Kristine Highland, daughter, aged 24 years; Leonharda Highland, daughter, aged 21 years; Anders Highland, son, aged 18 years; and Elisa Highland, daughter, aged 11 years— all of Falsund, Norway; and the petitioner, a daughter, aged 27 years, Portland, Oregon. Predicated upon the application, the defendant was appointed administrator of the estate and duly qualified for the trust.

The deceased had fully paid $600 in installments to E. J. Haight for lot 4 in block 5 in Maegly-Highland, Portland, Oregon, but in making the deed the premises were described as situate in Highland, a different addition to that city. The personal property of the deceased was of but little or no value. Mr. Highland had, however, built on the premises intended to be conveyed a shoemaker-shop about 14 by 14 feet, expending in the structure probably $50. The deceased was indebted on two promissory notes amounting to $184 and the defendant proposed to give for the land $500, and therewith to discharge such obligations, pay the hospital dues, medical attendance, and funeral expenses of the deceased, and to send the remainder of the consideration to the widow, if she and the heirs would relinquish their demand against Haight on account of the misdescription in the deed, and also direct him to execute another deed conveying the proper lot to the defendant. To effectuate this offer Tollisen caused to be mailed to Mrs. Highland a writing which being executed was returned to him and reads as follows:

"We, the undersigned, the heirs at law of L. Highland, deceased, release to E. J. Haight, of Portland,

Oregon, all our right, title, and interest in and to lot four, block five, Highland, Multnomah County, State of Oregon, heretofore conveyed to our father by E. J. Haight and wife, by mistake, and we hereby authorize and empower the said E. J. Haight and wife to convey lot four, block five, in Maegly-Highland, to Ole Tollisen, of Portland, Oregon.

"And in consideration of the said conveyance to the said Ole Tollisen, we hereby release and acquit the said E. J. Haight from all claim and demand of whatsoever nature we may hold against him, personally or as heirs of the said L. Highland, deceased.

"In witness whereof we have hereunto set our hands and seals this 7 day of December, 1897.

> "[Signed]   HANNE HIGHLAND.        [Seal.]
> "KRISTINE HIGHLAND.        [Seal.]
> "LEONHARDA HIGHLAND.      [Seal.]
> "ANDERS HIGHLAND.        [Seal.]
> "ELISA HIGHLAND.         [Seal.]

"In the presence of

> "[Signed]   GABRIEL OLSEN.
> "ALBERT VILHELMSEN."

Below these signatures is a sentence written in the Norwegian language, the admitted interpretation of which is:

"Above-signed names are correct, and are the names of the heirs which is hereby testified to. Vanse Partonhome, December 11, 1897. U. Koren. [Wax seal with impression.]"

The title appended to the latter name has not been translated, but the testimony shows that the person making the certificate was a parish priest, and it will be assumed that this designation is the official appellation referred to. Based on such relinquishment, Haight and wife executed to Ole Tollisen a deed correctly describing the premises intended to be conveyed to L. Highland which deed was duly recorded February

14, 1898. Thereafter the defendant claimed to be the owner of the land in fee, and collected and appropriated to his own use the rents obtained therefrom.

Aside from the appointment of the administrator, no further proceedings appear to have been had in the matter of the decedent's estate until January 7, 1904, when, in obedience to a demand therefor by the county judge of Multnomah County, the defendant filed a final report, stating that he had received no personal property belonging to the deceased; that the only real property of the estate consisted of an interest in lot 4, block 5, Maegly-Highland, Multnomah County, Oregon; that the sum of $346.85, giving the items thereof, had been expended in settling the debts of the deceased, paying funeral charges and other expenses. This report contains a paragraph which reads:

"That all of the said payments were made by your petitioner from his individual funds, and were made by him under an agreement with the heirs at law of said deceased that he should so pay the same, and in consideration thereof all of the heirs at law of the said deceased joined in an instrument in writing waiving and conveying to your petitioner all of their right, title, and interest in and to lot 4, block 5, Maegly-Highland, aforesaid."

Without publishing or giving to the heirs any notice of the final settlement, the County Court, on the day the report was filed, found that the facts as therein set forth were true in all respects, and, predicated thereon, made an order declaring that the estate had been fully administered upon; that the final account was allowed and settled; that the administrator was discharged; and that the sureties on his bond were exonerated from further liability.

Leonharda Highland, now Mrs. Benson, arrived in Portland, Oregon, in December, 1901; Anders Highland

and Kristine Highland, now Mrs. Sorenson, in the year 1902; and Mrs. Highland and her daughter Elisa, June 11, 1904. The defendant leased to his sister in law, Mrs. Sorenson, and her family the lot in question, collecting $6 a month for the use of a house thereon, and all the heirs upon their arrival in Oregon knew he was asserting a title to the premises. Mrs. Highland having died, Tollisen desired the heirs to execute to him confirmatory deeds, whereupon Fred T. Highland and his wife complied with the request, but the others, refusing to do so, instituted this suit to set aside the order of the County Court settling the final account of the administrator, and the cause, being at issue, eventuated as hereinbefore stated.

The plaintiffs severally testified that until the trial herein neither of them had seen the writing which purports to have been signed by them in Norway. Each admitted, however, that an inspection of the instrument showed that it had been subscribed to by their mother.

Fred T. Highland, a brother, residing at Pateros, Washington, testified that he had lived in the shoemaker's shop on the premises, but when his father died he was residing at Grand Forks, North Dakota; that he then received a letter from his sister Mrs. Tollisen, concerning their father's property, saying they would pay $500 for the lot, "or, if I thought it best" for the estate, they would have the land sold; that in reply the witness wrote, saying:

"If they wanted to give $500 and pay the expenses and send the rest of the money home to my mother, I thought that was doing more than anybody else would do.

"Q. Did you consider the lot was worth as much as $500?

"A. Not at that time."

This witness also stated upon oath that he subscribed his name to a writing of similar import to that referred to as having been signed by his mother and four of her children. In alluding to such instrument he was asked: "Did you receive anything in consideration for consenting to that arrangement?" He replied: "Not one cent." Having testified that he had frequently received letters from his mother, brothers, and sisters and was able to, and could, recognize the handwriting of each, the release given to Mr. Haight which purports to have been signed by them was exhibited to him, and he was asked:

"Examine the signature on that instrument, and say whether those are the true signatures, in your judgment."

He answered:

"I should say they were exactly.

"Q. You have no doubt they are the authentic signatures of the parties whose names are signed?

"A. Not in the least; not only the signatures, but I don't believe that [the writing] would have been attested by the priest in the old country unless they were absolutely genuine."

Further in his examination he was asked:

"Was there any explanation made to you at the time of this instrument being sent to you to sign concerning the amount of indebtedness—what indebtedness there was?

"A. Yes.

"Q. Do you remember how much indebtedness was represented to be against the property; about how much money would be left over to send to the old country, and all that?

"A. In the letters it was stated everything about how it would be sent, and the consequence was there would be somewhere around $100 left to send to the old country, and I sanctioned that as being all right.

"Q. Did you ever have a conversation with Mr. and Mrs. Tollisen in which you took up the complaint you had heard of Tollisen's claiming the property and discussed it with Mr. and Mrs. Tollisen in the presence of Anders and Mrs. Highland?

"A. I did.   I called that meeting myself.

"Q. What occurred at that meeting, and what was the nature of the discussion, and when did it occur, as near as you can remember?

"A. It occurred shortly—oh, I should judge probably three or four months—after mother came to the United States; three or four months after mother and my youngest sister, Elisa, arrived in this country; and from the time they arrived here up until this meeting there was a little growling concerning this property; and I could never get the right or wrong of it, or find out head or tail, how it stood, and I asked them, 'Did you get any money from Mr. Tollisen?' and they told me, 'No.' 'Well,' I said, 'if you didn't, we must go over to Tollisen and see about this here.   I want to find out.   I am sick of this growling around week after week.'   We made it a point to meet at Tollisen's this very night, and Tollisen got his books out.   He had it down in an old note-book, had it at the time, and he gave us where he had sent money to my mother, and every time he gave us that she was slow to answer, 'Yes,' and I had to ask two or three times,'Mother, did you get that?' And she said, 'Yes'; and there was never right out, but my mother she sanctioned this, too.   So I saw when we left there they had got all that was coming to them, as far as the lot was concerned, and when we came home I told them so, and that I was ashamed of the whole bunch.   That is the substance of that meeting.''

It is admitted that when this cause was tried the lot referred to and the improvements placed thereon were worth about $4,000.   The testimony shows that after Mr. Highland negotiated for the purchase of the premises at $600 the value of all unimproved suburban real property in Portland, Oregon, greatly depreciated, and

purchasers for lots of that kind could not be secured at almost any price. A. F. Flegel, an attorney who lived within four blocks of the lot in question from the year 1893 to 1903, in referring to the opportunity to sell such land in the latter part of 1897 and the early part of 1898, testified:

"There was absolutely no market. You could not sell property for money at all. We managed to get mortgagees to take some land rather than foreclose their mortgages, but there was no sale.

"Q. What was the reasonable value of lot 4, block 5, Maegly-Highland, at that time?

"A. There was no time during the year 1897 or 1898 that this lot would have sold for $350 in money."

1. Comparing the worth of the lot when this cause was tried with the market value at the time the writing was subscribed in Norway, it is evident that the great increase in the price of the land affords a temptation on the part of the plaintiffs to evade the consequences of their voluntary acts, and that it is reasonably certain from the testimony of their brother Fred that each severally subscribed his name to the writing. This deduction results from a consideration of the fact that no apparent motive is assigned for the opinion given by Fred T. Highland that his brothers and sisters signed the writing upon the faith of which the County Court of Multnomah County by its decree accepted the defendant's final report as administrator of the estate of his father in law and closed the account.

2. The writing signed by the plaintiffs and their mother, whereby the defendant secured a title to the land in consideration of $500, which was then the reasonable and full value of the premises, and was paid in the manner indicated, constitutes a settlement and distribution by the heirs of L. Highland who

at the time of the execution of the instrument were of legal age: *Loughary* v. *Simpson,* 75 Or. 219 (145 Pac. 1059). At that time the plaintiffs, Kristine Sorenson and Leonharda Benson had attained their majority, and neither has any right, title, claim, interest or estate in or to any part of lot 4, block 5, Maegly-Highland, Multnomah County, Oregon.

3. Anders Highland and his sister Elisa were of the ages of 18 and 11 years, respectively, when they signed the family agreement. This suit having been instituted April 24, 1913, Anders was then 34 years old, and, as he did not in any court assert his right to the land within 10 years after he became of age, he also has no estate in the premises.

When this suit was commenced Elisa was 27 years old, and 10 years—the extent of the statute of limitations—not having elapsed after she arrived at majority at the age of 18 years, she is entitled to an undivided one-sixth interest in fee in and to lot 4, block 5, Maegly-Highland, Multnomah County, Oregon, and the defendant, Ole Tollisen, is entitled to the remainder of the estate in fee therein.

4. As Elisa Highland received for the relinquishment no consideration, she was not obliged to repay any sum of money as a condition precedent to asserting her right to the land. Nor was it incumbent upon her to disclaim the exception of the writing so as not to be bound thereby on attaining her legal age; the 10-year limit, prescribed by the statute being a reasonable time within which to enforce her demand.

5. Since the defendant fully paid the sums of money stated, has made improvements upon the land, paid the taxes and assessments levied and imposed thereon, no accounting will be decreed between him and his cotenant, Elisa Highland, for any sums collected or

charged on account of rent of the premises, or payments made by him prior hereto.

The decree will therefore be modified and one entered in accordance with this opinion.      MODIFIED.

MR. JUSTICE BEAN, MR. JUSTICE BURNETT and MR. JUSTICE MCBRIDE concur.